Council, whenever you're ready, you may proceed. I'll speak louder. Okay, no, that's okay. I'm sorry, I was trying to listen to the clerk behind me there just a second. This is a really not that complicated a case. This is a situation where my client, the athlete Karen Schulze, has joint custody with Mr. Clark Schulze, their minor daughter, and the minor daughter had gone through a couple of custody battles between the parties in the past, and in 2005, the last custody battle they went through, after two days of trial, when they started out arguing and testifying and presenting all the witnesses, they reached an agreement after about two days of trial. And in the agreement, the order basically stayed the same way as it was in the original divorce decree, except for the fact that the respondent at that time, which would be Adelaide Clark Schulze, received two additional days of custody, one being on Tuesday afternoon, and the other being on Tuesday afternoon, including that night on Thursday night, so Tuesday afternoon and Thursday overnight. And the parties had joint custody originally, the joint custody continued from the original order into the agreed order, and Karen Schulze, who had been the primary fiscal custodian in the original order, retained most of the custodial period with the minor child, Delaney. The father, Mr. Schulze, at that time, at the time of the 2005 order, had Tuesday afternoon and three to a little while in the evening, and then he had Thursday overnight. He also had every other weekend, he also had the typical holidays and the typical summer vacation. When the parties reached their agreement in 2005 in that order, they put in there what has now become our infamous paragraph that everybody is fighting over, is a paragraph that states in number two of the 2005 order, it states that the minor child shall stay in the Vandaya school district. And that's what we're fighting over in this case. Facts changed, and that became an issue. Karen, at the time of the order, did reside in the Vandaya school district. At the time of the order, and that's where Delaney was going to school and was attending. Clark Schulze, the athlete in this case, resided in the Brownstown school district, and was not in the Vandaya school district. Karen Schulze, then in August of 2008, due to an impending marriage, new marriage, with a gentleman by the name of David Villalobos, who lived in Iuka, Illinois, which is about 30 miles south of Brownstown, Illinois, where the respondent's affilee lived. And Karen then, on the date of September, I think, 8th of 2008, did move down to what was going to be her new home with the minor child, Delaney. Delaney, there's only one child here, nine years old at the time. Delaney is the one that was required to remain in the Vandaya school district. What happened then, and Karen then, before she moved down, knowing this Vandaya school issue was going to be a problem, we filed a petition to try to alter that order, authorizing her to move the minor child out of the Vandaya school district, down into the, I think, initially it would have been the Iuka school district, Iuka, Illinois, and then into the Salem school district for high school. Iuka would still be the grade school system, however. And what happened after that, in anticipation of the move, she filed, like I said, a petition authorizing that. And, of course, we have the parties couldn't get along. They went through mediation to try to resolve it. It didn't work. Went to court, and so far, even after court, here we are, still hasn't resolved it. Delaney, the minor child, was nine years old at the time of the hearing, and she had lived with Karen since the original divorce back in 2000. Karen testified at the trial that the only visitation with Delaney and Clark that would be affected by her move down to Iuka and going into the Iuka school system at that time would be the Tuesday afternoon and the Thursday overnight stayings. And she testified that, in her opinion, the weekends wouldn't be affected. They could still do those, but they were only just a little further apart than they were before, 30 miles as opposed to about 10 or 12, and that the summer visitation wouldn't be affected, and that she truly believed the only visitation that was going to be affected at all would be the Thursdays and the Tuesdays. Okay. What had been worked out for Tuesdays and Thursdays at that time, when Karen moved to Iuka and took Delaney with her down there, and Delaney is already living down in Iuka, Illinois, she just has to attend the Vandaya school district, which is the problem here. And so when she moved down to the Vandaya, Karen would get Delaney up at 5 a.m. in the morning and take her to the Vandaya school system, and Karen, luckily, works at the Vandaya Correctional Center in Vandaya, Illinois, and so she could drop her off on her way to work. And, however, the school wasn't open at that time, and Karen had to be at work. So what Karen had to do is she had to drop the child off at a friend's house in Vandaya, which was a fellow employee of hers, to keep the child until the child would either walk to school or sometimes it was fairly close to the school where he lived, or he would take the child to school. Karen testified that Clark Schultz, and Clark also did this, he also works at the Vandaya Correctional Center. Karen Schultz wanted to enroll Delaney in the Iuka school system, and the Iuka school system is located 3 1⁄2 miles from their current residence, where they live in Iuka. Karen testified that she goes back to Iuka, obviously, after getting off work, and that she could pick up Delaney at the Iuka school, deliver her halfway back up to a little town called Sandoval, Illinois, and that Clark could meet him there. And I'm only now talking about the Tuesdays and Thursday visitation. The weekend's not a problem. You can still do those. On the Tuesdays and Thursdays, Karen has testified to this, that she can get off work in time, go down to Iuka, pick up the minor child, and take the child back to Sandoval, Illinois, which is halfway between Browns County and Iuka, by 4.15 p.m. for the Tuesday and Thursday visitation to take place. And Clark's testimony at trial was that all the visitation, I think, took place at 3 o'clock on Tuesdays and Thursdays. Clark couldn't get off at the correctional center at that time, so he had to pick up Delaney in Vandalia at around 4.10 p.m. in the afternoon. And according to Karen, the only setback or bad thing that would happen to Clark out of this is that he would lose five to ten minutes worth of visitation time on Thursdays and Tuesdays, and the fact that he would have to drive to Sandoval to meet that time frame. And obviously Karen did not think that made a hardship to be placed upon Clark Schultz. Mr. Schaffer, I thought that I read reference to another child that was also attending Vandalia. Yes. Yes, it's not of the party. Karen's? No? Karen, yes, it's not of the party. Okay, I understand that. Karen's older son, he's 15, he has been with Delaney since her birth. They have lived together since birth. And there was quite a bit of testimony at trial that the younger boy, I'm sorry his name escapes me right now, but he does take very good care of her. But he's attending. He's attending Vandalia High School also. And he is only doing that at this time because Delaney is still there. If it weren't for Delaney having to be stuck in the Vandalia School District, which is what the trial judge ruled on, he would be down with her. So it's affecting him also. He helps make sure that she gets to school on time, helps make sure that she's safe, and all of the factors that go along with helping take care of the nine-year-old. What about the residency requirements in the school district? Thank you. I've got to be brief. The court order may not be able to be complied with according to the school district. We don't know what's going to happen yet. Right now, and this stuff is in my brief, right now Delaney is basically still in the Vandalia School District awaiting the outcome of this court decision. And I've got this in my brief according to the school code. The school code doesn't have to accept Delaney as an out-of-district student. What about her stepbrother? Same situation there, allowing him to do that to assist her at this point. Being very generous, the school system is until this court rules. And yet it's very possible that the Vandalia School District says, we're not going to accept her. And if that happens, then the really unthinkable thing happens. Karen, her only resolution to that would be to have to move back up to Vandalia, away from her new husband and new home, to comply with the court order. And I really think that would have the effect of separating the family. Also, if the school accepts her as a student out-of-district, the tuition is $43, $42, $43 per day. It's a very hefty thing over the school year. I don't know how. It's more than some private schools. If that happens, and I don't know what kind of economic factors or input that will have on Karen also, just to comply with that. Like I said, in the actual briefs, especially in the reply brief, I've got a lot of these issues covered. I've got the school code section decided and so forth, dealing with that particular issue. Here is one other possibility or way that this order, what Karen was asking for to move her out of the district, could also affect Clark. And that would be that on Thursday night, when he had her overnight, on Friday morning, he would take her to the school, to Vandalia's school system. And he argues, well, you can't do that. Well, Karen has it figured by the driving time. She lives down there. She works at the same place Clark does. She knows what time of work he goes in today and says that it is possible that if he still wants to do that, he could drive her down to the Iuka school system in the morning and still be able to work in time to meet his schedule. That would be an inconvenience for him, but really nothing more than that. It could still happen as it is on the original order. Iuka is 32 miles straight south from Brownstown. The Sandoval is about 19 miles from Vandalia, and Vandalia is about 8 to 10 miles from Brownstown. So we're really not talking a very long distance here. Counsel, I've got two questions. Yes. This requirement of staying in the Vandalia district was part of the settlement of the custody dispute. Yes. If this court rules that the student does not have to stay in the Vandalia district, does that vitiate the settlement of the custody dispute and revive it, or could it be refiled? I don't believe so, Judge, and here's why. I have several cases cited, especially here again in my reply brief, but basically all of these cases seem to come out of the 3rd District, where in the 3rd District there was a case. I've got them cited here. I was going to get to those. That's okay. Okay. In the 3rd District case, there was a case that limited the agreement of the parties, which is exactly what we're here. They worked out a settlement agreement. The agreement of the parties was that they had to maintain in Sagamon County the residence of the kids. Something happened. The mother wanted to move with the kids, and, of course, that was denied by the appellate court, allowing her to move, saying the benefit of the bargain and all this type of stuff, went up on appeal, and the appellate court said that it was too restrictive. The 3rd District has ruled in several of these cases, just like this one, that restricting the child to a county is too restrictive, and it's not in the best interest of the child to have a restriction like that in there. And the courts were automatically basically going to deny those unless and until there was some really compelling reason as to why it should not be changed. And, in effect, it seems like the case law has shifted the burden to the appellee in this case to show that there's some why it's in the best interest of the child to restrict this child to that particular county. You're anticipating my second question. The basis of your argument, essentially, is you apply the Eckert factors. Yes. Assuming for the sake of argument that we determine that Eckert, since it explicitly dealt with an out-of-state transfer, does not apply, what is the standard that should be applied by the trial court and by this court on review? According to the case law that I have on file in my briefs, the case law is Eckert. The sole case, and remember the side, of course, is one of the latest cases decided on that issue and said the same factors. It was a 2003 case that was considered interstate or the same thing as intrastate, the same factors that are being considered. And what I ultimately get to, that even like the court just said, that if you think the Eckert factors should or should not apply, and then my argument is the court didn't use those. I mean, there's nothing in his ordinance that even talks about any of those factors. And that it was abused. I mean, therefore, he didn't follow the proper law, and as an automatic case, you know, it causes reversal or remand to be argued under the Eckert factors. At the trial court, the judge never gave either counsel an opportunity to argue at any time. At the close of the evidence, after the trial, I mean, we didn't get argued. And when I filed my motion to reconsider, I never got a chance. I mean, he came on the bench, basically said, I read your motion, it's denied. And I got no chance to argue any of this stuff at any time. Well, that's discretionary with the trial court, though, isn't it? Yes, Judge, it is. And that's why I do appreciate the time that I've got at least to explore this issue with the court. And, Judge, even if you apply the Eckert factors, and I truly believe that's the state of the case already. Well, let's assume that you don't. What standard would apply? Best interest? The best interest of the child is what is set forth in 609 in the statute dealing with this removal issue. The court has said in Eckert that these are the factors that you must consider in a removal system. I think Eckert is basically controlling that over 609. That is the best interest of the child. And I think Eckert says here's how you figure the best interest of the child by these factors. And then those have been adopted in interstate cases now. And then there have been three fairly recent cases, all of them out of the 3rd District, I think, that, like I said, they tried to restrict it. The parties by Eckert have restricted it to Sagamon County, and it was denied by the public court, saying that's too restrictive. There was another one, a case I've kind of cited in my brief, that restricted by agreement of the parties that the children would either live in Cass County or Sagamon County. Something came up where one of the parties requested to move out of those different counties. The trial court said they could not. It went up on appeal. The appellate court said it's too restrictive. It's not the best interest of the child. I think your time has expired, and we've read the briefs. Okay. So we'll consider that. Thank you. Counsel? And we'll give you a few extra minutes, too. Thank you. Can we please report? I think first off is, as it was brought up in the question, I think you need to look at the standard. What is the standard? I think the standard that's spelled out in our appeal, you look to in-ring marriage of, I'm going to mispronounce the name, but it's Sambersen. It's S-A-M-A-R-E-C-I-J-A. That's a third district case. The site on that is 365 Illinois 3rd, 702. Now, that was decided in 2006. So that is after the case that Mr. Schaefer cites is also after Sobel, which was decided in 2003. In that case, it says, the trial court in-ring married Sobel, or Sambersen, ordered that the mother not remove the child's residence from more than 25 miles from Orland Park without the father's consent by court order. You know, the most unique thing about this fact scenario, though, is that the non-primary custodial parent that is objecting doesn't live in the chosen school district either. And I haven't seen any case like this. I agree. Have you? I have not. It's pretty unique. And if you look to our three, now part of our argument was Mr. Schultz said, if it's required that I have to reside in Vandalia, I will. Also, as he testified to, this is the second time he's moved to be close to the child's school. Previously, he had lived outside of the Vandalia area. The child, before this November 2005 board was entered, the child was in the Brownstown school district. Mr. Clark had basically moved then to Brownstown to be closer to the child in the child's school. Well, and I appreciate there's no question that he's a very devoted father, but it would make more sense in considering the factors that you ordinarily consider if there was a residency involved. When you talk about extended family, you talk about friends and visiting people in the community and that type of thing, that's not occurring here. Well, I think it is. If you look now, he works in Vandalia and she works in Vandalia. And what his testimony in trial was, very easy for me to get equity in his home. He could basically, as he said, willing to rent a place in Vandalia and sell his home and move to Vandalia. So that's not been an issue. The reason why he has not moved is because at this time, as counsel had pointed out, the school district has been willing to wait. So in case the appellate court was to reverse the finding that it was abuse of discretion, then we don't have a situation now where he sold his home and in a bad market. But he has the equity and has the savings that he would be able and testified at trial willing to move in and rent a place in Vandalia so there wouldn't be these out-of-school district costs or issues. To go back to the standard of view, the appellate court found, once again in the Sanderson case, that the restriction for 25 miles was abuse of discretion. And so I think, as you had asked, Your Honor, what is the standard if it is not incurred? Well, I think it's basically best interest that it's abuse of discretion. And an abuse of discretion occurs where no reasonable person would agree with the position adopted by the trial court. This isn't a situation where we look upon this and we then have to go forward and we have the burden to show that this is what one judge may find or another judge may find. The standard is whether a reasonable person would. And as the court went through those factors, and I want to address this, most cases that do talk about freedom of movement within the state, interest rate movements, they address the situation where one person is the primary physical custodian. In this case, specifically in the 2005 order, there is a specific delegation that says no one is the primary custodian. Not Clark, not the mother. How important is this agreement? Let's change the facts a little bit. And he moved away, much further away where Vandalia was no longer convenient to him. Would he be able to attack the agreement? I think he could move for a motion to modify it. I think it would be based upon the facts, just like in this case. So you're not contending that we can't overrule the agreement. We have to bind the parties to the agreement. No, I agree with that. I think in this situation, and it says abuse of discretion, I think any time you deal with a custody or visitation issue, it's always modified, so long as the child is a minor. But I think what the court said here was we don't believe this should be modified. And the reasoning why, once again, comes back to, I think even as you had said, Your Honor, he's a very involved man. When you look at that order and how this case is different, the most interesting moves, once again, is we have no position that says one person is the primary custodian. One person's residence is the residence of the child. The second thing you also look to when you look to see is it says that a court and parental agreement or court orders may impose reasonable limitations upon the custodial choice of residence. That's what we have here. We have the agreement that was entered into on November 5, 2005. So the cases that I cite, and most of the cases that have been decided, I think this case is different. It's differentiated in the sense that, one, you have specifically no one is considered to be a primary custodian. No one has the primary residence of the child. And second, you also have a situation where the parties have agreed to this. Now, when you look at the November 2005 order, they say that there's a few minutes that it's going to be lost. That seems correct. When you look to what his visitation is, he had gone for basically every other weekend, and he had to write a first refusal on weekends. What he gained was he got every Tuesday from 3 o'clock p.m. until 9 o'clock p.m. He also gained it Thursday. Every Thursday from 3 o'clock until 9 o'clock came the following day. He also gained, on the weekend, kept the child overnight on Sunday. He did not have to return until Monday. Also to the physical custody on the holidays. This isn't where a lot of physical time for holidays is during that day. He receives the child at 9 o'clock on the day of the holiday, and receives the child until the following day at 9 o'clock. He also has a right of first refusal. He's allowed to sign the child up for the extracurricular activities he wishes, including solely in charge of soccer. Now, it also says that parenting is required to pay these activities to the minor child. As spelled out in the briefing by the testimony, Clark not only involved the child in these activities, he paid these fees. It wasn't that he signed the child up for all these activities then to make it more difficult for the mother. When you look to what activities, I want to go through first what he's going to miss. On Tuesdays, there is Just Say No program. That's after school until 345. There's Girl Scouts, which are from 430 until 6 o'clock p.m. And then there's also Band-Aid and NCAT. The testimony was, in the trial, Clark is the one that's always been involved with the Girl Scouts. He's the one that's always taken them. The testimony was that he's the one that goes to the functions. He goes to the meetings. He goes to the activities. By the distance was going to be 41 miles and some change is what it would be from the Band-Aid Correctional Department, where Clark is at work, and to where Karen resides. Now, in the brief they point out, it's closer from Brownstown to IUCAA. But Clark would be getting off work, so the true distance would be leaving from the Band-Aid Correctional Center. If Clark makes the whole trip himself, it's almost one hour one way and almost a whole hour the other way. That was his testimony that was also briefed to by Karen. If they meet halfway, even, Clark would get off at 4 o'clock. He would meet at 430 to pick up the child. He would then have to turn around and not be back until Vandalia at 5 o'clock at the earliest. That means Delaney would miss Just Say No, and she would also miss an hour of the Girl Scouts. As for the Vandalia-NCAT, Clark was the one who had taken them. There were two instances that he had testified that when Band-Aid-NCAT meetings were on other nights, that Delaney was dropped off and there was no class. Classes were canceled. He's gone to every recital. He's gone to practices. When you look into these overnight visitations on the Thursdays and on the Fridays up until Mondays, they say, well, he can still do it. He just has to get up early. That's not correct. I spelled out in my brief, it's an hour trip. Ms. Karen leaves herself at 5 o'clock, sorry, 530 in the morning to go to her job. She testified that he cannot drop the child off at Hoopa School or the main day school until 8 o'clock. Clark goes to work at 8 o'clock. If he was to have the child overnight, was not able to drop the child off until shortly before 8 o'clock, that he would still have an hour trip back. So he's going to be at least an hour late to work every day. Now, as we talked about in the morning, there was an argument that said, well, this child is having to get up so much earlier now because she is going to Band-Aid School District. Well, there's also the argument that with the child staying at Hoopa School District, the child is going to be home for a long, substantial period of time by the child itself. The testimony in trial was Karen would leave her residence at 5 o'clock in the morning to go to Iuka, I'm sorry, from Iuka to go to the Band-Aid School. Her current husband, David, leaves somewhere as early as 630 or as late as 7 o'clock. Karen and Seth, I'm sorry, Kaylee and Seth, Kaylee is the daughter of Karen's new husband. She's a high school student. Seth at the time of the hearing was in 8th grade, but at this time was in high school. For them to be able to be on the bus for high school to Salem, Iuka does not have a high school. The Iuka students go to Salem. They would have to be on the bus somewhere between 620 and 640. So Delaney's bus, by David's testimony, by her current husband who had children who went to school, said the bus would not come to pick Delaney up until 10 till 8 or 15 till 8. So at the earliest, there is an hour and 15 minutes every day that Delaney would be home by herself in that situation. There's also, at the best scenario, which is David is there until 7 o'clock, there's still 45 minutes where Delaney would have no supervision. No one would be there. Now there's testimony, well, they can go to David's sister's house or they can go to another family member. These people did not testify. They did not show up at the hearing to say they were willing to do this. This is just basically speculation that they're willing to do that. Mr. Payne, is there a breakdown of percentage of time taking all the activities and everything into consideration that Delaney spends with the mother versus the father? There's not specifically my brief. If I had to give an argument, I would say it's probably somewhere in the 60 to 65 percent is probably with the mother. And there is definitely no primary physical custodian name. And that is specifically spelled out in November 2005 order. It says they shall share joint physical and legal custody of the minor child. Neither shall be designated as the primary physical or legal custodian of the minor child. In addition to the argument that the court had addressed about where the HECR applied, if you look to our brief, it spells out in means it says because it's an intrastate move, those days the factors under HECR would not apply. 609 has to do with removal out of the state. Intrastate moves basically, once again, would be spelled out as an abuse of discretion. I think you look at the best interest. Now, as I spelled out in my brief and as I'm pointing out here, it's not that this necessarily affects just Clark's time. What is most important, what is in the best interest, is the child. This is affecting the child. Clark and Delaney have been the ones who have been involved in these activities. Not only the activities, but with sick days. The testimony was, and the exhibits that were omitted, there were 48 times that Clark had taken off early for work to attend either a school function, or Delaney was sick, or there was some activity or program. There will be an hour distance now, basically, if Delaney attends late for school. For both parents. Karen's move was not, as most situations are, where it's for employment. She is still working the same job. She is still required to go to Vandalia every day. She is still required to make that commute. Briefly, even on the factors of that person. One of the points the court looks to is whether or not it's going to be a benefit both to the child and to the mother. The only argument really addressed is that the mother would be allowed to reside with her new husband, and so therefore she would have less costs because she would be staying in his residence. But she also has an increased cost of the traveling distance. She also still has the same job, but now she's given her a substantially longer period of time of moving back and forth. As for the child, I don't think the child's the best interest. We have a father who, I think, characterized the best. He said, I don't want to be a weekend dad. I've been involved. I have attended activities. He has been Delaney soccer coach every year but once. He has missed no practices. He has missed no games. Clark has over 100 days of sick time left. And so the argument would be, well, he can just miss those things. He can just take that day off. He still has a situation where either party is at least an hour away before they'd be there for the child. School programs. Clark, for Girl Scouts, had provided the grass hula hoop. He had provided the soccer for the school program when they did How the West was Won. His mother had sold the outfit. Clark and his mother have been involved in these activities. His family has been there. Cheer clinics. Clark has attended all the cheer clinics. He has attended all the games. Karen's testimony was that she had gone to some recitals for dance. She had gone to some recitals for the cheer clinics. And she had gone to some of the games but she hadn't gone to all. Reading night. Clark has always wanted to take you to reading night. If you go through the activities that Clark is going to be giving up, his right of first refusal is basically gone. He's got a two-hour time that he would be going down south and going back. And there was even testimony that when Karen had left and had gone to either Clark, South Carolina or North Carolina, she had left Delaney there with him. Holidays. These times when he has to return the child on Friday and it's overnight on Thursday and when he returns the child on Monday. These will not be practical. He could not do these if the child goes to Ithaca because the child is not allowed to be dropped off early. It's not an inconvenience to him that he could potentially just drop the child off earlier. It's an impossibility. You have the child also to then, as we talked about, is not in supervision that the child was getting when they were in Bay Delta. If you look at the factors, as I started to address earlier, one of the factors is what's the motive? What's the motive of the person who's asking for the removal and what's the motive of the person who's contesting? I think it's clear from Clark's standpoint and from the testimony and the evidence why Clark is objecting. He basically is going to lose substantial periods of time, which he basically was able to get as part of his agreement back in November 2005 as his request to modify custody. Karen's argument that, look, I'm not doing this to frustrate his visitation. Her own testimony is, even when Clark had said he was willing to watch Delaney, she could drop Delaney off at his house while she was attending Vandalia School when Karen and Delaney was in Ithaca. Karen did not. He said, even if you want to bring Seth by, I can take Seth to school. That's fine. Karen did not. She took the child to Steve Buffs' house, someone who's not the parent and had the child stay there. I have one question for you, and I thought I read in Karen's brief that the court did ask the child her preference and that she did indicate that she wanted to go to school in Iuka or Salem or wherever that would be at the time she was asked. And I want to know, because I just noted that she was born in 99, so she's 10, will be 11 shortly, what consideration was it appropriate for the court to give and what consideration should we give to that? I'll make it brief. I think that the main reason why she said that she wanted to do that was because she could start band a year earlier. I think now, at this time… She could start what? Band a year earlier. She's going to do the drums, and I think at this time now she's eligible to do the drums. So that was one of her big considerations. And the court also specifically asked about her involvement in all of these activities. You know, I guess my question is, should we consider whatever her motives were? And I'm sure there might be a dispute about that, but should we consider that? And was the court proper if they did, in fact, consider that? Okay, I think the argument I can say there is the argument I give to every client when they ask, how old is my child, and they can decide where they reside or what they're supposed to do. And I always tell them the argument is 18. It depends upon the reasoning why. It's not necessarily their answer, but their motives and their consideration. If you have a 6-year-old child who wants to go live with a father because the mother hits the child or drinks, that, even though the age is young, that would potentially be a better reason than a 16-year-old child who says, well, I want to stay with my father because he lets me drive the Corvette to school and we watch SportsCenter each night. It depends upon what their reasoning is behind it. And I think on this situation her reasoning was mainly was the bank, and I think that's a non-factor. So. Okay, thank you. Thank you. Thank you. Thank you, counsel. Counsel? Thank you. Thank you. To further expand on that answer, what it amounts to, there used to be a law several years ago that if a child was 12 years of age or older, they got to say some preference as to where they wanted to stay. If they were under 12, they did. The law has since changed. What the law is that deals with that issue is any child of any age can testify as to their preference. What the law is now, however, is that the more articulate the child is, the better stated the reasons the child can give. I mean, if you just keep asking the child, well, do you want to move, you know, go with your mom or be in custody with your dad, they say yes or no, that's not sufficient. And no matter what answer the child does give, it's only one factor to be considered in the whole scheme of things. It's not to be given any more or any less weight than any other reference. This is just one of the factors in determining. But the issue, the context that that's normally dealt with is the issue of a change in custody. And this is just a little bit different. This is a preference of where she wants to live and leaving the school district rather than a change in custody. Also, I mean, we've got her testimony in the transcript. She did not like getting up early in the morning. There were numerous factors beyond the fact that she's going to be missing out on one year of bank, why she would prefer to be in the IUCAA school system. I think she did give more sufficient factors when she did talk about those. You know, there was argument here that Clark has a first right of refusal if, for whatever reason, Karen can't keep her, Karen goes on vacation, whatever. Clark, she has to first offer Delaney services for him to basically provide the babysitter. And that was one of the direct issues that was talked about in the Schmarzer case, that their argument as to why they should not let the mother move with the kids in that case was, the father's was, is because he had the first right of refusal, which is exactly one of the things they've argued in this case. The Schmarzer case also said the father argued that he would be unable to get a hold of the children promptly if something happened. They would be at a further distance and so forth. The court considered those factors and said that's not enough. And so they lifted the restriction. And in that particular case, the Schmarzer case, the 25 miles apart, they removed those restrictions and said that was not sufficient reason. The Schmarzer case, there's a manual case, and there is another case. There's three on my slide and my brief. And the bottom line is when they restrict them to smaller, I think these school districts are even smaller than a county in most cases. Sometimes it may not be, but in most cases it is. And if counties are too restrictive to decide, even by agreement by the parties that that's where a minor must stay, then I don't know how a school district can be any worse than that. And I think that the court did not apply the Eckert factors. I think this total case is absolutely clear that Eckert applies. I believe that even if there was an abuse, even if the Eckert factors, say the court says the court considered the Eckert factors and applies, then it comes down to an abuse of discretion. And the abuse of discretion, I believe, is covered by the last three cases that I have went over about the limit that doesn't matter anymore, about really the Eckert factors, that if they restrict it to too small of an area, then that's not in the best interest of the kid to do so unless they can show you a very good point of reason why that should be changed. Thank you very much. I appreciate it. Thank you, counsel. We appreciate the briefs of both counsel and their arguments. We'll take the case under adjournment.